UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| AJA GORSLINE, | Case No. 3:21-cv-00019-ART-CLB |
| Plaintiff, | ORDER |
| v. | |
| CHARLES DANIELS, Director of the Nevada Department of Corrections ("NDC") in his individual capacity; BRIAN WILLIAMS, Deputy Director of Operations; TIM R. GARRETT, Acting Warden and Associate Warden of the Lovelock Correctional Center ("LCC"); KIRK R. WIDMAR, Acting Associate Warden and Correctional Lieutenant of the LCC; BOBBY K. PRESTON, Correctional Lieutenant of the LCC; JASON C. CHACON, Shift Commander of the LCC; Tyler Randall, Correctional Officer previously identified as John Doe Corrections Officer; JOHN AND/OR JANE DOE CAPTAIN; JOHN AND/OR JANE DOE LIEUTENANT; JOHN AND/OR JANE DOE SERGEANT; JOHN AND/OR JANE DOES CORRECTIONS OFFICERS; JOHN AND JANE DOES 1 – 40, | |
| Defendants. | |

## I.  SUMMARY

Plaintiff Aja Gorsline ("Gorsline") was assaulted by an inmate, Toyanell Kuykendall ("Kuykendall"), while working as a case worker in Unit 2B at Lovelock Correctional Center ("LCC") on October 29, 2020. (ECF No. 26 at 18-20).[1] Before the Court is Defendants Charles Daniels, Tim R. Garrett, Kirk R. Widmar, Bobby K. Preston, Tyler Randall, and Jason C. Chacon's (collectively, "Defendants")

---

[1] The Court refers to page numbers of the Second Amended Complaint ("SAC") throughout due to inconsistent numbering of paragraphs in the SAC.

Motion to Dismiss Second Amended Complaint. (ECF No. 35). For the reasons described herein, the Court grants-in-part and denies-in-part Defendants' Motion.

## II. BACKGROUND

Gorsline began working at LCC in 2016 and was promoted to the position of case worker on June 29, 2020. As a case worker, Gorsline worked in Unit 2B.

Gorsline alleges numerous operational deficiencies in Unit 2B. First, Gorsline alleges that cameras in Unit 2B routinely malfunctioned, and were malfunctioning on the day she was assaulted. (ECF No. 26 at 9). NDOC staffing policies assumed video surveillance cameras would be functional to allow individual employees to surveil a wider area. (*Id.*) All defendants were allegedly aware that LCC cameras routinely malfunctioned. (*Id.*) Defendants Widmar and Preston were Associate Wardens at LCC and were responsible for surveillance under Operational Procedure ("OP") 495, but failed to take steps to repair the cameras or compensate for their malfunctioning by increasing staffing levels. (*Id.*) Defendant Daniels denied a request from LCC to replace LCC's camera system on February 3, 2020. (*Id.*) The request put Daniels on notice that "without appropriate camera coverage custody staff is at a disadvantage putting both staff and inmates at risk." (*Id.*)

Second, there were not enough functioning radios for case workers, and Gorsline was not provided a radio on the day of her assault. (*Id.* at 19). Case worker safety concerns were known to LCC staff. Another case worker, Cody Beckdite, raised concerns over the safety of case workers at LCC stemming from the nonissuance of duty belts and the lack of working radios to Defendants Widmar and Garrett, who took no action. (ECF No. 26 at 11). An unknown corrections officer mocked Beckdite's concerns by making a duty belt and tools out of cardboard and leaving it on his desk. (*Id.* at 12).

Third, Gorsline alleges widespread understaffing at LCC that was known to all

LCC employees and inmates, including Kuykendall. (ECF No. 26 at 11). This meant that Floor Officers were routinely not assigned to Unit 2B. (*Id.*) Floor Officers are responsible for patrolling the unit, inmate movement around the unit, and random pat searches of inmates entering and departing the unit. (*Id.* at 16). There was no Floor Officer assigned to Unit 2B on the day of Gorsline's assault. (*Id.* at 11).

Gorsline alleges that Defendants failed to cover staffing shortages as required by prison policies. On October 29, 2020, seventy (70) correctional officers were scheduled to work at LCC. (ECF No. 26 at 12). Somewhere between fourteen (14) and forty (40) were actually present. (*Id.*) Twenty-six (26) of the thirty-three (33) required positions for "emergency" operations were filled on the day Kuykendall assaulted Gorsline, leaving seven vacant posts, although none were in Unit 2B. (*Id.*) Defendant Chacon had a pool of three staff members he could have drawn from to staff the seven vacant emergency positions, but chose not to do so. (*Id.* at 14-15). The only position required under emergency staffing protocols in Unit 2B—Control Officer—was filled by Defendant Tyler Randall. (*Id.*)

One applicable policy, OP 326.02, requires that "any staffing level below these guidelines requires an affirmative decision from an Associate Warden or the Warden and a NOTIS [Nevada Offender Tracking Information System] entry be completed for PREA [Prison Rape Elimination Act] documentation purposes." (ECF No. 26 at 15). As Acting and Associate Warden, Defendant Garrett was required to affirmatively choose to operate LCC below the OP 326 guidelines. Defendant Chacon entered the required "NOTIS" entry indicating he was operating LCC below the OP 326 guidelines on the morning of October 29, 2020. (*Id.*) As Shift Commander, Defendant Chacon chose not to staff Unit 2B with a Floor Officer on October 29, 2020. (ECF No. 26 at 16). Floor Officers are responsible for inmate movement within the Units under PO 15-1405. (*Id.*)

Defendant Randall was assigned to work as Unit 2B Control Officer on October

29, 2020. (*Id.* at 16). As Control Officer, Defendant Randall was responsible for ensuring sally port doors were closed at all times other than when visiting staff or inmates needed to access the controlled area behind the sally port doors under PO 15-1405.3. (*Id.* at 17).

Inmate Toyanell Kuykendall ("Kuykendall") was incarcerated on May 28, 2015 after being sentenced to ten years to life for violent sexual crimes against women. (ECF No. 26 at 4). On August 28, 2015, Kuykendall was assessed as a "Very High" risk inmate and was subsequently transferred between NDOC institutions several times due to behavioral issues. (*Id.*) Throughout his incarceration Kuykendall was repeatedly assigned a lower risk score than his evaluation required due to a lack of prison resources. (*Id.* at 5). Kuykendall had a history of sexual misconduct while incarcerated, including inappropriate conduct towards staff members, which was known to an unknown Doe Defendant. (*Id.* at 20-21).

On or about June 6, 2019, Kuykendall was transferred to LCC. (*Id.* at 7). Kuykendall received a mental health evaluation by Dr. Caldwell-Barr, who determined that Kuykendall needed to be assigned to maximum security. (*Id.*)

Sometime between June 6, 2019, and August 7, 2020, an unknown Doe Defendant overrode Dr. Caldwell-Barr's recommendation to assign Kuykendall Level 1 status. (*Id.*) On October 29, 2020, Kuykendall was housed in Unit 2B at LCC. (*Id.* at 18).

On October 29, 2020, Defendant Widmar was scheduled to work as the Administrative Lieutenant between 8:00 a.m. and 6:00 p.m. (ECF No. 26 at 11). Widmar was not at LCC when Gorsline was assaulted because he chose to attend a graduation ceremony in Carson City instead. (*Id.*) Widmar allegedly did not ensure his position at LCC was covered by another employee. (*Id.*)

At 7:58 a.m. on October 29, 2020, Gorsline signed in for her shift at LCC. (*Id.* at 12). She alleges that Defendant Randall was on shift as Control Officer that morning from 9:00 a.m. to 9:30 a.m. (*Id.* at 16). There were no other staff

scheduled to work in Unit 2B on October 29, 2020. (*Id.* at 12).

Between approximately 9:00 a.m. and 9:30 a.m. on October 29, 2020, Inmate Kuykendall was allowed to open and close the sally port doors in Unit 2B to access the activity room and Gorsline's office on his own. (ECF No. 26 at 17). Kuykendall walked through the open sally port doors three times. (*Id.* at 18).

Defendant Randall was not at his post when Kuykendall entered the unit. (*Id.* at 17). Instead, Randall had left his post to use the restroom. (*Id.*)

At about 9:30 a.m. on October 29, 2020, Kuykendall entered the office Gorsline was in alone. (*Id.* at 18). Gorsline assumed that Kuykendall's actions were being monitored, but they were not. (*Id.*)

Kuykendall asked Gorsline questions about merit credits and his parole eligibility date and left the office. (*Id.*)

After visiting the Job Service Office outside the activity room, Kuykendall returned to Gorsline's office and sat down in a chair on the opposite side of Gorsline's desk. (ECF No. 26 at 18).

Kuykendall dropped a small handball on the floor which rolled underneath Gorsline's desk. (*Id.* at 18-19). Gorsline reached under the desk to pick up the ball. (*Id.* at 19).

Kuykendall rushed around the desk, grabbed Gorsline, and body slammed her to the floor, causing her to lose her breath. (*Id.*). Gorsline did not have a radio, weapon, or any way to trigger an alarm. (*Id.*)

Kuykendall held a pen to Gorsline's throat and told her to turn around. (*Id.*) Gorsline pleaded with Kuykendall and screamed for help. (ECF No. 26 at 19). Kuykendall attempted to stab Gorsline's throat with the pen, but Gorsline prevented him from doing so. (*Id.*) Gorsline continued to scream for help. (*Id.*)

Kuykendall then tried to strangle Gorsline. (*Id.*) Gorsline struggled with Kuykendall to prevent him from strangling her. (*Id.*) In response, Kuykendall began punching Gorsline in the face, breaking her nose and causing Gorsline's

blood to splatter the office. (ECF No. 26 at 19, 21-22).

Gorsline realized that Randall was not present and stopped screaming. (*Id.* at 19). Kuykendall hesitated and loosened his hold on Gorsline. Gorsline then attempted to trigger an alarm by knocking the office phone off the hook, but failed. (*Id.*) Kuykendall again slammed Gorsline to the floor; Gorsline continued to struggle against Kuykendall. (*Id.* at 19-20).

Gorsline then successfully knocked the phone off the hook and kicked it away from Kuykendall. (ECF No. 26 at 20). Kuykendall chased after the phone and released his grip on Gorsline. (*Id.*) Gorsline ran out of the office yelling for help. (*Id.*) As she did so, Gorsline heard Kuykendall say, "I'm done." (*Id.*)

Once in the activity room, Gorsline screamed for Defendant Randall to let him know she had been assaulted. (*Id.*)

Senior Correctional Officer Harlow entered the activity room and Gorsline told him Kuykendall was in her office. (*Id.*)

Hearing Gorsline's screams, Randall returned from the restroom to his post and sounded a separate alarm to call for help. (*Id.*)

A search of Kuykendall's person revealed he had concealed several razor blades in his sock, which he intended to use in his assault on Gorsline. (*Id.*)

Gorsline brings one claim under 42 U.S.C. § 1983 for violation of her civil rights. (ECF No. 26 at 22-23).[2]

Defendants move to dismiss on the grounds that Gorsline failed to state a claim under *Twombly* and *Iqbal*. (ECF No. 35 at 2). For the reasons discussed below, the Court grants-in-part and denies-in-part Defendants' Motion to Dismiss. (ECF No. 35).[3]

---

[2] Gorsline withdrew her second claim for injunctive relief in her response to Defendants' Motion to Dismiss. (*See* ECF No. 38 at 21 fn.3).
[3] The Court notes that Gorsline indicated Defendant Williams will be dismissed at oral argument.

### III.    LEGAL FRAMEWORK

In evaluating a Rule 12(b)(6) motion to dismiss, the Court takes all factual allegations as true and draws all reasonable inferences in favor of the nonmoving party. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). Rule 12(b)(6) applies where a complaint lacks either "a cognizable legal theory" or "sufficient facts alleged" under such a theory. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1209 (9th Cir. 2019). Whether a complaint contains sufficient factual allegations depends on whether it pleads enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must allege facts that "plausibly give rise to an entitlement to relief" to survive a 12(b)(6) motion. *Iqbal*, 556 U.S.at 679. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023) (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011)). Personal liability under § 1983 requires a plaintiff to plead "that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Here, Gorsline's remaining claim is rooted in the substantive component of

the Due Process Clause of the Fourteenth Amendment. The Due Process Clause provides that "No State shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause constitutes a limitation on state action, rather than a guarantee of minimum levels of state protection or an affirmative right to government aid. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989). As a general rule, "the state's failure to prevent acts of private parties is typically insufficient to establish liability under the Due Process Clause." *Murguia*, 61 F.4th at 1106 (citing *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). The "state-created danger exception," relevant here, is an exception to the general rule "when the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" *Herrera v. Los Angeles Unified Sch. Dist.*, 18 F.4th 1156, 1158 (9th Cir. 2021) (quoting *Patel*, 648 F.3d at 971-72). The Ninth Circuit has expressly declined to create a new cause of action where a state actor merely fails to perform an act he is legally required to do. *See Murguia*, 61 F.4th at 1108.

The state-created danger exception has two elements. "First, the exception applies only where there is 'affirmative conduct on the part of the state in placing the plaintiff in danger. Second, the exception applies only where the state acts with 'deliberate indifference' to a 'known or obvious danger.'" *Id.* (quoting *Patel*, 648 F.3d at 974) (cleaned up).

To satisfy the first element, a plaintiff "must show that the officers' affirmative actions created or exposed her to an actual, particularized danger that she would not otherwise have faced." *Id.* at 1111 (quoting *Martinez*, 943 F.3d at 1271). A danger is particularized if it is directed at a specific victim or specific group of victims. *See Sinclair v. City of Seattle*, 61 F.4th 674, 682 (9th Cir. 2023) ("In *Hernandez*, officers 'shepherded [plaintiffs] into a violent crowd of protestors and actively prevented them from reaching safety.") (alteration in original) (citing

*Hernandez*, 897 F.3d at 1138). "In examining whether an officer affirmatively places an individual in danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not have been available to the individual. Instead we examine whether the officers left the person in a situation that was more dangerous than the one in which they found him." *Murguia*, 61 F.4th at 1111 (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000)). "[T]he state actor is liable for creating the foreseeable danger of injury given the particular circumstances." *Martinez*, 943 F.3d at 1273-74 (quoting *Kennedy* v. *City of Ridgefield*, 439 F.3d 1055, 1064 n.5 (9th Cir. 2006)); *see also Murguia*, 61 F.4th at 1111 n.11 (recognizing that the Ninth Circuit has on occasion deemed foreseeability an element to the state-created danger exception).

To satisfy the second element, deliberate indifference, a defendant "must 'recognize[] the unreasonable risk and actually intend[] to expose the plaintiff to such risks without regard to the consequences to the plaintiff.'" *Murguia*, 61 F.4th at 1111 (quoting *Herrera*, 18 F.4th at 1161). Deliberate indifference is a standard higher than gross negligence and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Patel*, 648 F.3d at 974).

The Ninth Circuit has made clear that the deliberate indifference standard applicable to non-detainee failure-to-protect claims is distinct from the standard employed in excessive force claims, medical-care claims and civil immigration failure-to-protect claims where the plaintiff is detained. *See Herrera*, 18 F.4th at 1160. While the deliberate indifference standard in detainee failure-to-protect claims incorporates an objective standard when determining whether the defendant's actions were reasonable, the deliberate indifference standard in *non-detainee* failure-to-protect claims, like the one at issue here, is "purely subjective." *Id.*

1    The upshot of the purely subjective deliberate indifference test applicable here
2    is that the "state actor must 'know[] that something *is* going to happen but
3    ignore[] the risk and expose[] [the plaintiff] to it." *Murguia*, 61 F.4th at 1111
4    (alterations in original) (quoting *Herrera*, 18 F.4th at 1161). Deliberate
5    indifference may exist where the danger is "so obvious as to imply knowledge of"
6    it. *Kennedy*, 439 F.3d at 1064 (quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir.
7    1996) ("*Grubbs II*")). "The deliberate-indifference inquiry should go to the jury if
8    any rational factfinder could find this requisite mental state." *Murguia*, 61 F.4th
9    at 1111 (quoting *Patel*, 648 F.3d at 974). "In evaluating deliberate indifference,
10   circumstances are vital in contextualizing a defendant's decisions." *Herrera*, 18
11   F.4th at 1163. Whether the plaintiff was left without protection is a "crucial
12   premise" of the deliberate indifference analysis. *See id.* (collecting cases). And,
13   the immediacy of the danger weighs significantly in the analysis. *See Patel*, 648
14   F.3d at 975-76 (differentiating cases that survived motions for summary
15   judgment on the basis that the state actors in those cases disregarded an
16   immediate risk to the plaintiff).

17       Contrary to Defendants' arguments in this action, however, the state actor
18   need not literally know of the exact harm that will befall the plaintiff to proceed
19   past a motion to dismiss. *See, e.g.*, *Martinez*, 943 F.3d at 1273 (analysis does not
20   require "that the exact injury must be foreseeable.") Instead, foreseeability of the
21   *danger* of injury is required. *See Kennedy*, 439 F.3d at 1064 n.5; *Hernandez*, 897
22   F.3d at 1136 (knowledge of the danger required). Deliberate indifference exists
23   when a defendant knows of a serious risk of physical harm to the plaintiff (or the
24   risk of physical harm to the plaintiff is so obvious as to imply knowledge), the
25   defendant disregards that risk, and the defendant leaves the plaintiff in a
26   situation that was more dangerous than the one in which he found them.

27       For example, in *Munguia*, a "close case," the Ninth Circuit allowed claims to
28   proceed against a police officer—Sergeant Garcia—who took a mentally ill mother

and her ten-month-old twins from a shelter to a motel, where the children drowned later that night. *See Murguia*, 61 F.4th at 1113-14. There were no allegations that Sergeant Garcia was aware of the mother's "history of child cruelty, violence, or previous mental health difficulties." *Id.* at 1113-14. A dispatcher falsely told Garcia that the mother did not have any history of child abuse. *Id.* at 1114. But, the Ninth Circuit nonetheless denied defendants' motion to dismiss in *Murguia* as to Garcia because he witnessed the mother's erratic behavior at the shelter—"Garcia was aware that [the mother] was undergoing a mental health crisis but was not aware that [the mother] had a history of violent behavior." *Id.* The Ninth Circuit continued, "[g]iven the extreme vulnerability of the ten-month old twins, the complaint adequately alleges Garcia was aware that [the mother] posed an obvious risk of physical harm to the twins based on her worrisome behavior." *Id.* "Garcia can be charged with deliberate indifference for ignoring the obvious risk of leaving the babies unattended with [the mother]." *Id.* "[T]he complaint adequately alleges Garcia knew [the mother's] mental health crisis posed a serious risk of physical harm to the twins but nonetheless disregarded this risk and left the twins in a situation that was more dangerous than how he found them." *Id.*

Conversely, the *Murguia* court found two other officers—Lewis and Cerda—were *not* liable under the state-created danger exception when they allowed the mother and her friend to leave the mother's home with the twins even though the twins' father was competent and immediately available to take custody of them. The court reasoned that Lewis and Cerda replaced one competent adult—the twins' father—with another competent adult—the mother's friend—and therefore did not leave the twins in a situation that was more dangerous than the one in which they found them. *Id.* (citing *Munger*, 227 F.3d at 1086). The court in *Murguia* dismissed with leave to amend as to these two defendants.

**IV. DISCUSSION**

In their Motion to Dismiss (ECF No. 35) Defendants argue that Gorsline has failed to state a plausible Due Process claim against any Defendant because none of Gorsline's allegations show actual knowledge of impending harm on the part of any Defendant, and no Defendant took affirmative acts to put Gorsline in a particularized danger. Gorsline argues that she has alleged sufficient facts in her Second Amended Complaint ("SAC") to survive dismissal. (ECF No. 38).

**A. State-Created Danger**

At the outset it is important to note that Gorsline's reliance on Defendants' alleged failure to comply with various administrative regulations and operational procedures is not in-and-of-itself a source of liability in this action. This is because the Ninth Circuit has expressly declined to create a substantive due process cause of action under § 1983 where a state official fails to perform an act he is legally required to do. *See Murguia*, 61 F.4th at 1108 (failure to comply with a legally required duty, without more, cannot give rise to a substantive due process claim).

The Court also notes that at oral argument, Defendants argued that Gorsline's bending down to pick up the handball Kuykendall dropped meant she opened herself up to the assault and effectively broke the chain of causation between her assault and any acts by Defendants. In the Ninth Circuit, this argument is for the ultimate trier of fact. In *Wood v. Ostrander*, 879 F.2d 583, 586 (9th Cir. 1989), the Ninth Circuit reversed a granting of summary judgment where a police officer left the female plaintiff in a high-crime area at 2:30 a.m. The plaintiff got into a car with a stranger for a ride home, and the stranger subsequently raped her. The police officer's decision to leave the woman alone in a high-crime area exposed her to a danger to which she otherwise would not have been exposed. The Court explained that it could not "resolve on our review of summary judgment whether Wood acted unreasonably by accepting a ride with an unknown man.

12

The resolution of these questions is for the trier of fact." *Id.*

Finally, at oral argument the parties debated the distinction between an act and an omission. The Supreme Court foreclosed liability attaching as a result of omissions in state-created danger actions in *DeShaney*, 489 U.S. at 200-02. There, social workers and local officials were held not liable under § 1983 on a failure-to-act theory for injuries inflicted on a child by his father, even though the state actors had received complaints that the child was being abused by his father and failed to remove the child from the father's custody.

Therefore, to be liable under the state-created danger exception, a state actor must take an affirmative action that exposes the plaintiff to a danger they otherwise would not have faced. *See Murguia*, 61 F.4th at 1111; *Martinez*, 943 F.3d at 1271. Put another way, courts must "examine whether the officers left the person in a situation more dangerous than the one in which they found him." *Murguia*, 61 F.4th at 1111 (quoting *Munger*, 227 F.3d at 1086). Importantly for this action, where there are numerous alleged operational deficiencies at LCC, the action must leave the plaintiff in a more dangerous position than she was in before the action. The Court addresses the affirmative action and deliberate indifference requirements for each defendant in turn. Where a defendant fails on one element, the Court does not reach the other element.

### 1. Defendant Randall

Gorsline has adequately stated her § 1983 claims against Defendant Randall under the state-created danger exception. Gorsline argues that Randall increased the risk of physical harm to her by leaving his post to use the restroom without ensuring another LCC employee was present to cover his position.

Defendant Randall took the affirmative act of leaving his post for at least fifteen minutes to use the restroom around 9:30 a.m. on October 29, 2020. (ECF No. 26 at 17, 18). By leaving his post unfilled without any other officer in Unit 2B, Randall left Gorsline in a more dangerous situation than she otherwise would

have been in. *See Murguia*, 61 F.4th at 1111. The danger of inmate assault was enhanced by Randall's absence and particularized to Gorsline because she was left unprotected in Unit 2B. *See id.*; *Sinclair*, 61 F.4th at 682. Assuming the facts alleged in the SAC are true, Randall could be "liable for creating the foreseeable danger of injury given the particular circumstances" under the first prong of the state-created danger analysis. *Martinez*, 943 F.3d at 1273-74 (quoting *Kennedy*, 439 F.3d at 1064 n.5).

The SAC also alleges that Defendant Randall was deliberately indifferent to the danger posed to Gorsline by his leaving his post. Randall allegedly left Gorsline completely without protection, as he was the only Officer scheduled to work in Unit 2B that day and Gorsline had no other protection due to malfunctioning surveillance cameras, not being issued a duty belt or radio, and lacking any weapon or other means of defending herself against an assault by an inmate. (ECF No. 26 at 16-17). "A crucial premise of [the Ninth Circuit's] findings of alleged deliberate indifference in *Hernandez, Munger, and Kennedy* was that plaintiffs were left without protection." *Herrera*, 18 F.4th at 1163. Randall was allegedly deliberately indifferent for ignoring the obvious risk of leaving Gorsline alone with the sally port doors entirely uncontrolled in a Unit housing 167 inmates, including violent sex offenders like Kuykendall.

Based on the allegations in the SAC, a rational factfinder could find that the danger of inmate assault on a staff member was either known or obvious to Randall. The alleged open mocking of Beckdite's concerns about case worker safety within the unit underscored that the risks were known or entirely obvious to him based on his assignment as Control Officer. *See Kennedy*, 439 F.3d at 1064; *Grubbs II*, 92 F.3d at 900. A Control Officer's duties include restricting the movement of inmates, visually identifying anyone attempting to enter the unit, and announcing any time a member of the opposite gender from the inmate population enters the unit. (ECF No. 26 at 17). The purpose of these duties is to

ensure the safety of inmates and staff in the unit.

Construing all allegations in the SAC as true, a reasonable factfinder could conclude that Randall disregarded an immediate, obvious, and entirely foreseeable danger of inmate assault when he left his post without any backup, thereby leaving Gorsline in a more dangerous situation than she otherwise would have been in. Therefore, the Court denies Defendants' Motion to Dismiss as to Defendant Randall. *See Murguia*, 61 F.4th at 1111 ("The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state.")

### 2. Defendant Chacon

Shift Commander Chacon failed to fill all posts mandated to fulfill minimum staffing requirements under OP 326.01, failed to request overtime help, and failed to staff Unit 2B with a Floor Officer. (ECF No. 26 at 11, 13, 14, 15, 16). The cumulative result of these decisions was that Unit 2B was operated with allegedly insufficient staffing on October 29, 2020. (*Id.* at 16).

Although these failures may have been a dereliction of Chacon's duties, none were an "affirmative act [that] create[d] an actual, particularized danger." *Martinez*, 943 at 1272 (quoting *Hernandez*, 897, F.3d at 1133). Chacon's failure to follow NDOC's relevant policies and procedures cannot create liability under the state-created danger exception because the Ninth Circuit expressly rejected arguments that a state actor's "omi[ssion] to perform an act which he is legally required to do that causes the deprivation of which [the] complaint is made" creates liability under a substantive due process claim. *Murguia*, 61 F.4th at 1107 (quoting *Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007)).

The language of Gorsline's Response to Defendants' Motion to Dismiss is telling. Defendant Chacon "failed to appropriately adjust his shift roster," "failed to request overtime help," and "failed to staff Unit 2B with a Floor Officer." (ECF

No. 38 at 15). Although discovery might reveal that Chacon's staffing decisions on October 29, 2020 were anomalous, and therefore left Gorsline in a worse position than she otherwise would have been in, they are fundamentally omissions—failures to act, or failures to comply with policy—not affirmative acts. But, because the Court does not believe amendment would be futile as to Chacon, the Court grants Defendants' Motion to Dismiss as to Chacon with leave to amend.

### 3. Defendant Garrett

Acting Warden Garrett failed to create a list of mandatory overtime to fulfill the LCC's minimum staffing requirements. (ECF No. 26 at 14). Garrett also "affirmatively [chose] to operate the LCC below the OP 326 guidelines" knowing that Chacon had indicated he had only forty (40) staff at LCC between 6:00 a.m. and 10:00 a.m. on October 29, 2020. (*Id.* at 15).

As discussed, Garrett's failure to create a list of mandatory overtime does not give rise to liability under the state-created danger exception. But, the SAC adequately alleges an affirmative action by Defendant Garrett because he was allegedly "required to affirmatively choose to operate the LCC below the OP 326 guidelines" as Acting and Associate Warden on October 29, 2020. (*Id.* at 15). However, the SAC makes no allegations that this action left Gorsline worse off than she would have been without this affirmative action. Gorsline should have the opportunity to amend her complaint as to Garrett, however, because based on the allegations in the SAC the Court cannot conclude that amendment would be futile. This is especially true given that the SAC clearly alleges that Garrett knew about the risk to case workers like Gorsline after Beckdite's complaint, and actively ignored both his complaint and the subsequent mocking of Beckdite's security concerns. (ECF No. 26 at 11-12). Therefore, the Court grants Defendants' Motion to Dismiss as to Garrett with leave to amend.

### 4. Defendant Widmar

Acting Associate Warden Widmar was scheduled to work as the Administrative Lieutenant at LCC from 8:00 a.m. to 6:00 p.m. on October 29, 2020. (ECF No. 26 at 12). Widmar was not at LCC when Gorsline was attacked because he chose to attend a graduation ceremony in Carson City, allegedly without ensuring that another LCC employee was available to undertake his responsibilities. (*Id.*)

Widmar's decision to skip part of his shift on the morning of October 29, 2020 created a particularized risk to case workers at LCC, including Gorsline. In *Hernandez* the Ninth Circuit allowed claims against police officers to survive dismissal because the officers exposed a group of persons—pro-Trump rally attendees—to a risk of harm they otherwise would not have faced. *Hernandez*, 897 F.3d at 1135. There, the officers directed the pro-Trump rally attendees towards a crowd of anti-Trump protestors the officers knew were violent, and therefore left the pro-Trump attendees in a more dangerous situation than they otherwise would have faced. *Id.*

Unlike in *Hernandez*, where the plaintiffs alleged that they "would have made it 'to safety' had the Officers not affirmatively directed them into the crowd of protesters" here Gorsline has alleged no facts that indicate Widmar's absence left her or any case worker in her position less safe on October 29, 2020. *Id.* Gorsline alleges that Widmar "ignored the risk of harm" to Gorsline and LCC staff caused by his absence, but not that Widmar's absence exposed Gorsline to any danger to which she otherwise would not have been exposed. Therefore, the Court grants Defendants' Motion to Dismiss as to Widmar. Because the Court cannot conclude that amendment would be futile based on the allegations in the SAC, the Court also grants leave to amend.

### 5. Defendant Preston

Operational Lieutenant Preston was responsible for surveillance in Unit 2B and "failed to take any steps to repair the cameras or put in place other safety

measures to compensate for the impact on minimum staffing levels." (ECF No. 26 at 9-10). Preston also knew LCC staffing levels were insufficient and knowingly operated the prison regardless. (*Id.* at 16). As discussed, these omissions are not actionable under the state-created danger exception because they are omissions, not affirmative actions. *See Murguia* 61 F.4th at 1108. As the Court believes amendment would be futile as to Preston, the Court grants Defendants' Motion to Dismiss regarding Preston without leave to amend.

### 6. Defendant Daniels

NDOC Director Daniels knew security cameras at LCC were nonfunctional and was warned that a lack of functioning security cameras would place "both staff and inmates at risk." (ECF No. 26 at 10). Daniels nonetheless denied a request from LCC for functioning video monitoring. (*Id.*) Even construing Daniels' denial as an affirmative action, rather than an omission, Daniels is not liable because his denial of the request to replace LCC's camera system did not leave Gorsline worse off. *See Murguia*, 61 F.4th at 1111. Gorsline alleges that LCC's cameras were malfunctioning before and after Daniels' denial. As the Court believes amendment would be futile as to Daniels, the Court grants Defendants' Motion to Dismiss regarding Daniels without leave to amend.

### 7. Defendant Williams

At oral argument Gorsline indicated that she would stipulate to dismiss Defendant Williams. In anticipation of that dismissal, Defendants' Motion to Dismiss Defendant Williams is denied without prejudice.

### B. Workers' Compensation

Defendants argue that workers' compensation is the exclusive remedy here because Gorsline alleges negligence on behalf of the Defendants. (ECF No. 35 at 12-13).

"The Nevada workers' compensation system provides the exclusive remedy of an employee against his employer for workplace injuries." *Lipps v. S. Nevada*

*Paving*, 998 P.2d 1183, 1184 (Nev. 2000) (citing *Butler v. Bogdanovich*, 705 P.2d 662, 663 (Nev. 1985)). But "to the extent workers' compensation precludes recovery for other causes of action, it does not preclude recovery for claims involving 'substantive rather than procedural constitutional rights.'" *Jensen v. City of Oxnard*, 145 F.3d 1078, 1084 n.3 (9th Cir. 1998) (citing *Daniels v. Williams*, 474 U.S. 327, 338 (1986) (separate opinion of Stevens, J.) ("If the claim [concerns a] … violation of one of the specific constitutional claims of the Bill of Rights[], a plaintiff may invoke § 1983 regardless of the availability of the state remedy.")

Defendants argue that *Washington v. D.C.*, 802 F.2d 1478 (D.C. Cir. 1986) should control in this action. There, a prison under court order to correct unsafe prison conditions relocated an exceptionally dangerous inmate to a cell block that usually housed less dangerous prisoners. The inmate beat and seriously injured a guard with a metal pipe. The *Washington* court held that there was no remedy under § 1983, only the D.C. Workmen's Compensation Act. The court concluded that "the reckless failure to act with which appellees are charted does not constitute a deprivation of 'any rights, privileges, or immunities protected under the Constitution and laws' of the United States." *Id.* At 1481.

Importantly, though, the *Washington* court did not analyze the case under the applicable test here—the state-created danger exception—and therefore should not be accorded any weight in the analysis. This is especially true because it was decided prior to *L.W. v. Grubbs*, where the Ninth Circuit held the plaintiff, a nurse at a corrections facility who was sexually assaulted by an inmate, had stated a claim under § 1983 "because Defendants, acting in their capacity as state correctional officers, affirmatively created a significant risk of harm to her, and did so with a sufficiently culpable mental state." 974 F.2d 119, 123 (9th Cir. 1992) ("*Grubbs I*").

Nevada's workers' compensation system may provide an alternative remedy

for Gorsline in this action, but the existence of a state workers' compensation scheme does not preclude liability under § 1983 where affirmative conduct of a state actor exposes a plaintiff to an actual, particularized danger which they otherwise would not have faced, and the state actor acted with deliberate indifference by disregarding a known or obvious consequence of their action. *See Murguia*, 61 F.4th at 1111.

**C. Qualified Immunity**

Defendants next argue that they are entitled to qualified immunity. (ECF No. 13-14).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)). "The plaintiff bears the burden of proving that 'the right allegedly violated was clearly established at the time of the alleged misconduct.'" *Martinez*, 943 F.3d at 1275 (quoting *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991)).

"[C]learly established law' should not be defined 'at a high level of generality." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). "Rather, it 'must be particularized to the facts of the case.'" *Id.* (quoting *White*, 580 U.S. at 79). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014)).

"There need not be a case directly on point for a right to be clearly established." *Id.* (citing *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018)). However, "existing precedent must have placed the statutory or constitutional question beyond debate" because "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117

(9th Cir. 2017) (quoting *White*, 580 U.S. at 78). "To deny immunity, we must conclude that every reasonable official would have understood, beyond debate, that the conduct was a violation of a constitutional right." *Martinez*, 943 F.3d at 1275.

In *Grubbs I*, the Ninth Circuit found that Defendants "independently created the opportunity for and facilitated" an inmate's assault on the plaintiff, a prison nurse. *Grubbs I*, 974 F.2d at 122. The nurse's supervisor elevated her attacker's access and allowed him to work alone with the nurse, whom he sexually assaulted. *Id.* at 120. In *Grubbs I* the "government actors violated [the nurse's] constitutional rights by intentionally placing her in a position of known danger, that is, in unguarded proximity with an inmate whose record they knew included attacks upon women." *Id.* The defendants' acts in *Grubbs I* "independently created the opportunity for and facilitated [the inmate's] assault on [the plaintiff]" *Id.* at 122.

*Grubbs I* stands for the proposition that a state actor may be liable under the state-created danger exception when a state prison employee leaves another employee alone in the prison, unprotected, and unmonitored with a known-violent inmate, especially when the unprotected employee is a woman, and the inmate has a history of sexual violence towards women. Here, Defendant Randall left his post. When coupled with the alleged operational deficiencies at LCC, Randall's absence left Gorsline alone, unprotected, and unmonitored. Based on the facts alleged in Gorsline's SAC and construing them in the light most favorable to Gorsline, were Randall at his post he would have observed Kuykendall attempt to enter Gorsline's office and could have either prevented the assault or stopped it as soon as it began, rather than leaving Gorsline alone to fight for her life.

Here, Defendant Randall's actions violated a clearly established right at the time of the alleged misconduct as laid out in *Grubbs I*, and therefore is not

1    shielded by the doctrine of qualified immunity.

2    **V. CONCLUSION**

3    It is therefore ordered that Defendants' Motion to Dismiss (ECF No. 35) is

4    granted-in-part and denied-in-part as discussed herein.

5

6    DATED THIS 23rd day of May 2023.

7

8    _____

9    ANNE R. TRAUM
     UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28