Scott H. Zwillinger (No. 019645)
Jennifer L. Allen (027941)
Benjamin L. Rundall (031661)
**ZWILLINGER WULKAN PLC**
2020 North Central Avenue, Suite 675
Phoenix, Arizona 85004
Tel: (602) 609-3800
Fax: (602) 962-3800
Email: scott.zwillinger@zwfirm.com
         jennifer.allen@zwfirm.com
         ben.rundall@zwfirm.com

Nicole M. Harvey
Nevada State Bar No. 11147
4894 Sparks Boulevard
Sparks, Nevada 89436
Tel: (775) 832-3012
Email: nicole@nevadacounsel.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| AJA GORSLINE,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>TYLER RANDALL,<br><br>　　　　　Defendant. | Case Number<br>3:21-cv-19<br><br>**THIRD AMENDED COMPLAINT**<br><br>JURY DEMAND |

For her Complaint against Defendants, Plaintiff Aja Gorsline alleges as follows:

**PARTIES**

1.　Plaintiff Aja Gorsline is a resident of Pershing County, Nevada who is employed by the Lovelock Correctional Center ("LCC") as a Case Worker who at the relevant time was assigned to work in Unit 2B of the LCC.

2.　Defendant Tyler Randall ("Defendant Randall") is a Corrections Officer, previously identified as Doe Corrections Officer, who was assigned to the Unit 2B Control Officer post on 10/29/2020.

3. At all relevant times described herein, Defendants were acting under the color of law.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action and the parties.

5. Venue is proper in this Court.

## GENERAL ALLEGATIONS

6. Plaintiff Aja Gorsline began working as a correctional officer trainee at the LCC in 2016.

7. Aja was soon promoted to Correctional Officer, and she worked in various units at LCC.

8. On June 29, 2020, Aja was promoted to the administrative position of Case Worker.

9. As a Case Worker, Aja's duties included annual inmate reviews, reclassification reviews, inmate screenings, file audits, and researching and addressing inmate grievances.

10. As a Case Worker, Aja did not wear a duty belt or otherwise perform duties related to security and safety.

11. Instead, no different than other case workers and other non-correctional staff, she relied on correctional staff such as Defendant Randall to keep her safe by ensuring security of the prison and following established safety protocols.

12. According to NDOC records, Inmate Toyanell Kuykendall ("Kuykendall") began incarceration on or about May 28, 2015 as a 19-year-old "first timer"; he was sentenced to ten years to life for violent sexual crimes against women and held at Clark County Detention Center.

13. Kuykendall was involved in a fight at the Clark County Detention Center, and transferred to a higher level of custody in High Desert Correctional Center as a result; a pattern that continued through his incarceration.

2

14. On August 28, 2015, Kuykendall was correctly assessed as a "Very High" risk inmate and was housed at High Desert State Prison.

15. Kuykendall continued to cause problems while incarcerated, which resulted in his transfer to other secure facilities such as LCC.

16. On or about June 6, 2019 when he was transferred to LCC, Kuykendall received a mental health evaluation by Dr. Caldwell-Barr, who correctly determined that Kuykendall needed to be assigned to maximum security.

17. Put simply, Kuykendall was a dangerous inmate with a known propensity for violence by correctional officers at LCC, including Defendant Randall.

18. LCC's Post Order 15-1405 ("PO 15-1405") applies to Unit 2B, which is the location of the occurrence giving rise to this lawsuit.

19. At all relevant times, Defendant Randall was responsible for supervision of Unit 2B in order to provide a safe and secure working environment for non-correctional staff such as Aja.

20. Due to the number of duties that the Case Workers perform and for safety reasons, at least one Case Worker and a Corrections Officer serving as a "Floor Officer" are required to be scheduled in Unit 2B, according to PO 15-1405 and sound correctional practice and management.

21. PO 15-1405, 3.1.1 instructs:

> This Unit is staffed with one Correctional Officer assigned as the Floor Officer and one Correctional Officer assigned as the Control Officer. It is the responsibility of the Shift Sergeant to ensure that this Position is staffed appropriately during duty hours. The Shift Lieutenant has the authority to utilize one (1) officer as a pull position between 0600 hours and 2300 hours without requiring the Unit to be locked down. In the absence of an assigned floor officer, the unit caseworker may be issued the unit keys & radio. The caseworker may conduct unit count or any other duties as needed.

22. On October 29, 2020 there was no assigned Floor Officer, despite the requirement of PO 15-1405,

23. Upon information and belief, Defendant Randall knew on the date of the incident Aja was alone in Unit 2B with no assigned Floor Officer.

3

24. In addition to the absence of a Floor Officer, there were not enough working radios that were available to be assigned out each day to Case Workers.

25. As a result, despite established policies and procedures and good correctional practice and management, Aja and other Case Workers routinely were not given radios to, among other things, call for help or assistance.

26. The lack of available working radios and the danger this created was well known by all LCC staff, including Defendant Randall.

27. On 10/29/2020, Aja signed in for her shift at the LCC at 7:58 a.m.

28. She was scheduled to work in Unit 2B by herself but was protected from inmates by electronically controlled sally port doors which prevented them from entering her office without prior knowledge of the Unit 2B Control Officer.

29. On that same date, Defendant Randal worked as the Unit 2B Control Officer, overseeing the sally port doors controlling ingress and egress to Unit 2B, and Aja's office.

30. Upon information and belief, Defendant Randall knew that Aja was working by herself and alone in Unit 2B on the day of the incident.

31. Under PO 15-1405.3.1.6, as Unit 2B Control Officer, Defendant Randall was required to announce on the tier to staff such as Aja any time a member of the opposite gender from the inmate population entered the unit.

32. Under PO 15-1405.3.4.2, Defendant Randall was responsible to ensure all sally port doors were closed, including visual inspection of the sally ports to ensure they were clear of inmates before the control room door was opened.

33. Under PO 15-1405.3.4.3, Randall was responsible for keeping the sally port doors closed at all times.

34. If unit staff, visiting staff or inmates needed to make access to the Unit 2B officer Randall could open two doors to allow them to make access.

4

35. Under PO 15-1405.3.4.4 Randall was responsible for controlling all individuals who entered the unit and was also required to visually identify anyone at the main requesting entry port into the unit or Aja's office.

36. On the day of the incident, however, Defendant Randall abandoned his post controlling the sally port doors to Aja's office, knowingly leaving her vulnerable and exposed to dangerous inmates such as Kuykendell.

37. As such, Defendant Randall was deliberately indifferent to Aja's safety and security.

38. As a direct and proximate result of the individual and collective actions of Defendants set forth above, between approximately 9:00 am and 9:30 am on October 29th, Inmate Kuykendall was allowed to open and close the sally port doors in Unit 2B to access the activity room and Aja's office ***on his own, without having his movements observed and controlled.***

39. Inmate Kuykendall was housed in Unit 2B with approximately 167 other inmates.

40. Inmate Kuykendall walked through the open and uncontrolled sally port doors from the housing unit into the activity room three times without challenge or control.

41. At approximately 9:30 a.m. on October 29th, Inmate Kuykendall entered the office Aja was in alone as a result of the actions and inactions detailed above.

42. Incorrectly and tragically, Aja believed Kuykendall's movements were observed and controlled by Defendant Randall.

43. She did not know that Defendant Randall had abandoned her and left his station.

44. Kuykendall asked Aja a question about his merit credits and parole eligibility date.

45. Aja answered his questions and the inmate left the office.

5

46. Inmate Kuykendall then returned to the activity room and went to the Job Service office, which is located outside the activity room.

47. Thereafter, Inmate Kuykendall returned to Aja's office and sat in the chair opposite and across her desk.

48. After sitting down, Inmate Kuykendall dropped a small handball that rolled under the desk, and believing she had space enough to do it safely, Aja reached to pick up the ball.

49. Inmate Kuykendall then rushed around the desk, grabbed Aja and body slammed her on the floor.

50. The impact from being slammed to the ground caused Aja to lose her breath.

51. Aja did not have a radio, weapon, or any means of setting off an alarm.

52. Quite literally, Aja was alone and about to fight for her life.

53. Inmate Kuykendall immediately held a pen to Aja's throat and told her to, "be quiet and turn around."

54. Believing he was going to sexually assault her or worse, Aja pleaded with Inmate Kuykendall not to do this.

55. Kuykendall responded that he had taken drugs earlier and was out of control.

56. Aja screamed for help, but her screams went unanswered because Defendant Randall was not at his post

57. Inmate Kuykendall then tried to stab Aja in the neck with the pen, but Aja was able to grab the pen and prevent it from penetrating her neck.

58. Inmate Kuykendall, however, continued to apply pressure on the pen, tried to stab her in her neck with his whole body weight, and became increasingly more aggressive.

59. Aja continued to scream and do her best to fight off the attacker.

60. When he was not able to stab her with the pen, Inmate Kuykendall then dropped the pen and tried to strangle Aja. Choking her, Kuykendall told her, "be quiet and turn around."

61. Aja continued to grab Inmate Kuykendall's hands and fought to prevent him from strangling her.

62. Frustrated that Aja would not relent, Inmate Kuykendall started punching her in her face with his closed fist causing blood from her face to splatter all over the office.

63. Aja then attempted to knock over the office phone, hoping to trigger the system warning that automatically issues when a phone is off the hook for thirty seconds or more, but her first attempt was unsuccessful.

64. Inmate Kuykendall then slammed Aja to the floor once again.

65. Aja continued to fight, hoping to get away, and resumed screaming for help.

66. Desperately, Aja tried to escape the office.

67. Inmate Kuykendall, however, continued to assault her and tried to bite Aja's neck as she struggled.

68. Aja then made another attempt to knock over a desk phone and was successful; Inmate Kuykendall released his grasp on Aja to hang up the phone, and she kicked the phone away from him.

69. Inmate Kuykendall then chased the phone presumably to hang it up.

70. Seizing this opportunity to save her life, Aja ran around the desk and out of the office, yelling for help.

71. As she left the office, she heard Inmate Kuykendall say, "I'm done."

72. In the activity room, Aja screamed for Defendant Randall, to let him know she was assaulted, and she sat in the activity room to catch her breath.

73. Defendant Randall still was nowhere to be found.

74. Senior Correctional Officer Harlow entered the activity room and Aja told him Inmate Kuykendall was in her office.

75. Defendant Randall later came to his post and sounded a separate alarm to call for help.

76. Aja was later escorted to medical for evaluation.

77. When Kuykendall was searched, he was found to have several razor blades hidden in his sock; upon information and belief he intended to use them in this premeditated attack on Aja.

78. In addition to the heinous violent sexual crimes that resulted in his sentence, Inmate Kuykendall had additional incidents of sexual misconduct while in prison, including inappropriate conduct towards staff members.

79. As a result of that attack, Aja suffered significant physical and emotional injuries.

80. As a result of the assault, Aja suffered contusions and bruising all over her face and body as well as a broken nose. In addition to her physical injuries, Aja is being treated for anxiety and sleep disruption.

81. As a result of her physical and psychological injuries, Aja is no longer able to work with or near inmates.

82. Aja's treating provider has recommended controlled reintroduction to the prison environment with proper safety controls in place, and LCC has declined to comply with the recommendation because it is not possible to provide proper safety controls due to a lack of cameras and inability to minimally staff the prison.

**CLAIM FOR RELIEF**

**COUNT ONE**

**VIOLATION OF CIVIL RIGHTS – 42 U.S.C. § 1983**

83. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth here.

84. At all relevant times, Defendant Randall was acting under color of law.

85. The United States Constitution guarantees Plaintiff the right to maintain the integrity of hereown body.

86. The Fourteenth Amendment of the United States Constitution precludes those acting under color of law from depriving Plaintiff of the rights guaranteed to her by the United States Constitution, including the right to maintain the integrity of their bodies without due process of law.

87. As set forth above, Defendant Randall knowingly created an obvious and well-known dangerous condition, that would have not have existed and to which Plaintiff would not have been subjected but for his affirmative actions.

88. The danger of said conditions to Aja was obvious and known by Defendant Randall.

89. Defendant Randall had a duty and obligation to protect Plaintiff, and Plaintiff relied on Defendant Randall to protect her.

90. Yet Defendant Randall chose to leave his post and knowingly exposed Plaintiff to an increased risk of harm.

91. In knowingly and intentionally creating dangerous conditions to which Plaintiff was exposed and in failing to take any steps to ameliorate the danger or otherwise protect Plaintiff, Defendant Randall acted with deliberate indifference to Plaintiff's right to maintain the integrity of her body and other rights guaranteed to her by the United States Constitution, including the Fourteenth Amendment.

92. As a direct and proximate result of Defendant Randall's deliberate indifference, and resulting harm, Plaintiff sustained traumatic physical and emotional injuries as set forth in substantial detail above.

93. Consequently, Defendant Randall violated the due process rights guaranteed to Plaintiff by the Fourteenth Amendment of the United States Constitution.

9

94. The acts and omissions of the Defendant Randall were of such a nature as to entitle Plaintiff to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

95. Further, pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to an award of her incurred fees and costs.

## JURY TRIAL DEMAND

96. Plaintiff hereby demands a jury trial in this matter as to all claims and against all Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff hereby demands a jury trial in this matter as to all claims and against all Defendants.

A. For compensatory, general and special damages in favor of Plaintiff and against Defendant Randall jointly and severally, in an amount to be proven at trial;

B. For punitive and exemplary damages against Defendant Randall in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

C. For pre-and post-judgment interest to the extent provided by law;

D. For Plaintiff's incurred costs, including all incurred attorneys' fees and court costs, pursuant to 42 U.S.C. § 1988 and as otherwise authorized by any other statute or law;

E. For such other relief as this Court may deem proper.

RESPECTFULLY SUBMITTED this 30th day of December, 2024.

**ZWILLINGER WULKAN PLC**

By: */s/ Scott Zwillinger*

|   |   |
|---|---|
| | Scott H. Zwillinger<br>Jennifer L. Allen<br>Benjamin L. Rundall<br>2020 North Central Avenue, Suite 675<br>Phoenix, Arizona 85004 |
| | **NEVADA COUNSEL LLC** |
| By: | */s/ Nicole M. Harvey*<br>Nicole M. Harvey<br>4894 Sparks Boulevard<br>Sparks, Nevada 89436 |
| | *Attorneys for Plaintiff* |

E-filed and served via email this same day upon:

Kyle Hoyt
Marni Watkins
Office of the Nevada Attorney General
khoyt@ag.nv.gov
mkwatkins@ag.nv.gov
Attorneys for Defendant

/s/ Brittany T.

11