1

2                    UNITED STATES DISTRICT COURT

3                          DISTRICT OF NEVADA

4    AJA GORSLINE,                    Case No. 3:21-cv-00019-ART-CLB

5                         Plaintiff,  **ORDER DENYING MOTION TO**
                                      **DISMISS**
6        v.
                                      (ECF No. 64)
7    TYLER RANDALL,

8                         Defendant.

9           Plaintiff Aja Gorsline brought this civil rights lawsuit after she was

10   assaulted by an inmate while working as a case worker at Lovelock Correctional

11   Center ("LCC"). Gorsline alleges that Nevada correctional officers violated her Due

12   Process rights under 42 U.S.C. § 1983 and the "state-created danger" doctrine.

13   After an appeal to the Ninth Circuit, Plaintiff's second amended complaint (ECF

14   No. 26) was dismissed without prejudice. Plaintiff filed a third amended complaint

15   which removed several defendants, so that Tyler Randall, a corrections officer at

16   LCC, is the only remaining Defendant. (ECF No. 56.) Defendant now moves to

17   dismiss Plaintiff's third amended complaint (ECF No. 64). For the following

18   reasons, the Court denies the motion to dismiss.

19   **I.  BACKGROUND**

20   **A. Allegations in Third Amended Complaint**

21          Gorsline is a case worker at LCC who, at the time of the events in this case,

22   was assigned to work in Unit 2B. (ECF No. 56 at ¶ 1.) Defendant Tyler Randall is

23   a corrections officer who was assigned to the Unit 2B Control Officer post on

24   October 29, 2020. (*Id.* at ¶ 2.) As a case worker, Gorsline's duties included annual

25   inmate reviews, inmate screenings, file audits, and researching and addressing

26   inmate grievances. (*Id.* at ¶ 9.) Gorsline "did not wear a duty belt or otherwise

27   perform duties related to security and safety." (*Id.* at ¶ 10.) Instead, she relied on

28   correctional staff such as Randall to keep her safe by ensuring the security of the

prison and following established safety protocols. (*Id.* at ¶ 11.)

Inmate Toyanell Kuykendall was first incarcerated in May 2015 as a 19-year-old after being sentenced to ten years to life for violent sexual crimes against women. (*Id.* at ¶ 12.) After Kuykendall was involved in a fight at the Clark County Detention Center, he was transferred to a higher level of custody at High Desert Correctional Center. (*Id.* at ¶ 13.) In August 2015, Kuykendall was assessed as a "Very High" risk inmate. (*Id.* at ¶ 14.) In June 2019, Kuykendall was transferred to LCC and received a mental health evaluation which determined that he needed to be assigned to maximum security. (*Id.* at ¶ 16.) "Kuykendall was a dangerous inmate with a known propensity for violence by correctional officers at LCC, including Defendant Randall." (*Id.* at ¶ 17.)

At all relevant times, Randall was responsible for supervision of Unit 2B, including providing a safe and secure working environment for non-correctional staff such as Gorsline. (*Id.* at ¶ 19.) According to prison policy, at least one case worker and one corrections officer serving as a floor officer are required to be scheduled in Unit 2B. (*Id.* at ¶ 20.) On October 29, 2020, there was no assigned floor officer in Unit 2B, despite those requirements. (*Id.* at ¶ 22.) Gorsline alleges that Randall "knew on the date of the incident that [Gorsline] was alone in Unit 2B with no assigned Floor Officer." (*Id.* at ¶ 23.) Prison policy also provides that "[i]n the absence of an assigned floor officer, the unit caseworker may be issued the unit keys & radio," but there were routinely not enough radios to be assigned to case workers. (*Id.* at ¶¶ 21, 24.) Gorsline alleges that Randall knew about "[t]he lack of available working radios and the danger this created." (*Id.* at ¶ 26.)

On October 29, 2020, Gorsline signed in for her shift at LCC at 7:58 a.m. (*Id.* at ¶ 27.) She was scheduled to work in Unit 2B by herself but was protected from inmates by electronically controlled sally port doors which prevented them from entering her office without prior knowledge of the Unit 2B control officer, who on that day was Randall. (*Id.* at ¶¶ 28, 29.) Gorsline alleges that "Randall

knew that [Gorsline] was working by herself and alone in Unit 2B on the day of the incident." (*Id.* at ¶ 30.) Under prison policy, Randall was required to announce to staff such as Gorsline any time an inmate of the opposite gender entered the unit. (*Id.* at ¶ 31.) Randall was also responsible for ensuring that all sally port doors were closed, including by visual inspection of the sally port doors to ensure they were clear of inmates before the control room door opened. (*Id.* at ¶¶ 32, 33.) Randall was also responsible for identifying anyone requesting entry into the unit or Gorsline's office. (*Id.* at ¶ 35.)

On the day of the incident, however, Randall "abandoned his post controlling the sally port doors to [Gorsline's] office, knowingly leaving her vulnerable and exposed to dangerous inmates such as Kuykendall." (*Id.* at ¶ 36.) As a result, between 9:00 a.m. and 9:30 a.m., Kuykendall was allowed to open and close the sally port doors in Unit 2B to access the activity room and Gorsline's office on his own. (*Id.* at ¶ 38.) Gorsline believed that Kuykendall's movements were observed and controlled by Randall and did not know that Randall had left his station. (*Id.* at ¶¶ 41, 42.) At around 9:30 a.m. on October 29, 2020, Kuykendall entered Gorsline's office and asked her a question about his merit credits and parole eligibility date. (*Id.* at ¶ 44.) Gorsline answered the question and Kuykendall left the office. (*Id.* at ¶ 45.)

Kuykendall then returned to Gorsline's office and sat in the chair across from her desk. (*Id.* at ¶ 47.) Kuykendall dropped a small handball that rolled under the desk. (*Id.* at ¶ 48.) Gorsline reached to pick up the ball. (*Id.*) Kuykendall then rushed around the desk, grabbed Gorsline and body slammed her to the floor, causing her to lose her breath. (*Id.* at ¶¶ 49, 50.) Gorsline did not have a radio, weapon, or any means of setting up an alarm. (*Id.* at ¶ 51.) Kuykendall held a pen to Gorsline's throat and told her to "be quiet and turn around." (*Id.* at ¶ 53.) Gorsline pleaded with Kuykendall and screamed for help. (*Id.* at ¶¶ 54, 55.) Kuykendall then tried to stab Gorsline in the neck with the pen. (*Id.* at ¶ 57.)

1    Gorsline was able to grab the pen and prevent it from penetrating her neck. (*Id.*)

2    Kuykendall then tried to strangle Gorsline. (*Id.* at ¶ 60.) Gorsline struggled

3    to prevent him from strangling her. (*Id.* at ¶ 61.) Kuykendall started punching her

4    in the face, causing blood to spatter all over the office. (*Id.* at ¶ 62.) Gorsline tried

5    to knock over the office phone, hoping to trigger a system warning that issues

6    when a phone is off the hook for thirty seconds or more, but this attempt was

7    unsuccessful. (*Id.* at ¶ 63.) Kuykendall continued to assault her as Gorsline

8    struggled to escape the office. (*Id.* at ¶¶ 63–67.) Gorsline then successfully

9    knocked the phone off the hook and kicked it away from Kuykendall. (*Id.* at ¶ 68.)

10   Kuykendall chased the phone and Gorsline ran out of the office, yelling for help.

11   (*Id.* at ¶ 70.) In the activity room, Gorsline screamed for Randall, but Randall was

12   nowhere to be found. (*Id.* at ¶¶ 72, 73.) Senior Correctional Officer Harlow entered

13   the room and Gorsline told him that Kuykendall was in her office. (*Id.* at ¶ 74.)

14   Randall later came to his post and sounded an alarm to call for help. (*Id.* at ¶ 75.)

15   A search of Kuykendall's person revealed he had concealed several razor blades

16   in his sock, which he intended to use in his assault on Gorsline. (*Id.* at ¶ 77.)

17   As a result of the assault, Gorsline suffered psychological and physical

18   injuries, including contusions and bruising all over her face and body and a

19   broken nose. (*Id.* at ¶¶ 80, 81.) Gorsline brings a claim under 42 U.S.C. § 1983,

20   alleging that Defendant Randall violated her Fourteenth Amendment Due Process

21   rights under 14 U.S.C. § 1983. (*Id.* at ¶ 83–95.)

22   **B. Procedural Background**

23   This case is before the Court again after an interlocutory appeal to the

24   Ninth Circuit. Defendants appealed the Court's prior order which granted in part

25   and denied in part their motion to dismiss Gorsline's second amended complaint,

26   and the Ninth Circuit reversed, holding that Gorsline had failed to state a claim

27   against Randall but that she should be granted leave to amend. (ECF No. 53.)

28   Plaintiff filed her third amended complaint in December 2024, seeking to cure

the deficiencies identified by the Ninth Circuit. (ECF No. 56.) Randall, the sole remaining Defendant, now moves to dismiss that complaint, arguing that it fails to state a claim and that he is entitled to qualified immunity. (ECF No. 64.)

## II. LEGAL STANDARD

In evaluating a Rule 12(b)(6) motion to dismiss, the Court takes all factual allegations as true and draws all reasonable inferences in favor of the nonmoving party. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). Rule 12(b)(6) applies where a complaint lacks either "a cognizable legal theory" or "sufficient facts alleged" under such a theory. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1209 (9th Cir. 2019). Whether a complaint contains sufficient factual allegations depends on whether it pleads enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must allege facts that "plausibly give rise to an entitlement to relief" to survive a 12(b)(6) motion. *Iqbal*, 556 U.S. at 679. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## III.    DISCUSSION

### A. State-Created Danger

A state actor may be held liable under the state-created danger doctrine if they (1) commit "affirmative conduct" that created a "particularized danger" for the plaintiff that she "would not otherwise have faced," and (2) act with "deliberate indifference" to that "known or obvious danger." *Polanco v. Diaz*, 76 F.4th 918,

926 (9th Cir. 2023) (citations omitted). Deliberate indifference "is a subjective standard that requires a plaintiff to allege facts supporting an inference that the official recognized an unreasonable risk and actually intended to expose the plaintiff to such risk." *Id.* at 928 (citation omitted). Deliberate indifference requires proof that a state actor "disregarded a known or obvious consequence of his action." *Murguia v. Langdon*, 61 F.4th 1096, 1111 (9th Cir. 2023), *cert. denied sub nom. Tulare v. Murguia*, 144 S. Ct. 553 (2024) (internal quotation marks and citation omitted). This standard is higher than gross negligence and requires a culpable mental state. *Id.*

The Ninth Circuit dismissed Plaintiff's complaint because she "fail[ed] to allege facts indicating that Randall was aware that leaving his post would expose Gorsline to a particularized risk of harm." (ECF No. 53 at 3.) The court noted that Gorsline had not included "allegations as to whether Randall knew he was leaving Gorsline alone without protection in Unit 2B" or allegations as to "Randall's awareness of any deficiencies in LCC's staffing or security protocols or risks posed by the inmate population housed in Unit 2B." (*Id.* at 3–4.)

Defendant argues that Plaintiff's third amended complaint does not cure the deficiencies that the Ninth Circuit identified. Plaintiff argues that the third amended complaint cures the deficiencies by clarifying that Randall knew Gorsline was alone without protection, was aware of staffing deficiencies, knew that LCC's security protocols posed a risk, and knew that Unit 2B inmates were dangerous. (ECF No. 70 at 3.) The Court finds that Gorsline's amended complaint adequately alleges facts indicating that Randall was aware that leaving his post would expose Gorsline to a particularized risk of harm.

In her third amended complaint, Gorsline alleges that Randall knew that Kuykendall was a dangerous inmate with a known propensity for violence. (ECF No. 56 at ¶ 17.) Gorsline alleges that Randall knew on the date of the incident that Gorsline was alone in Unit 2B with no assigned floor officer. (*Id.* at ¶¶ 23,

30.) Gorsline alleges that Randall also knew that Gorsline and other case workers were routinely not given radios because of a lack of working radios and that Randall knew that the lack of radios created a danger. (*Id.* at ¶ 24–26.) Gorsline alleges that despite being responsible for monitoring and controlling the doors of the unit and the entry of individuals into Gorsline's office, Randall abandoned his post, "knowingly leaving her vulnerable and exposed to dangerous inmates such as Kuykendall." (*Id.* at ¶¶ 35–36.) Taking these allegations as true and construing them in the light most favorable to Gorsline, a reasonable juror could conclude that Randall "recognized an unreasonable risk and actually intended to expose the plaintiff to such risk." *Polanco*, 76 F.4th at 928 (citation omitted).

### B. Qualified Immunity

Defendant argues, in the alternative, that he is entitled to qualified immunity. Qualified immunity is inappropriate if, accepting all of Plaintiff's allegations as true, Defendant's conduct "(1) violated a constitutional right that (2) was clearly established at the time of the violation." *Polanco*, 76 F.4th at 925 (quoting *Ballou v. McElvain*, 29 F.4th 413, 421 (9th Cir. 2022)). At the motion to dismiss stage, "dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies." *Id.* (quoting *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016)).

Based on the third amended complaint, Plaintiff sufficiently alleges a violation of her due process rights to be free from a state-created danger, as explained above.

"For the unlawfulness of an officer's conduct to be 'clearly established,' it must be the case that, 'at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he [wa]s doing [wa]s unlawful." *Polanco*, 76 F.4th at 930 (quoting *District of Columbia v. Wesby*, 583 U.S. 48 (2018)). "In other words, existing law must have placed the unconstitutionality of the officer's conduct beyond debate." *Id.* (internal

1  quotation marks and citation omitted). In *Polanco*, which involved allegations of

2  state-created danger by the survivors of a prison guard who died after contracting

3  Covid-19 at work, the Ninth Circuit affirmed the denial of defendants' motion to

4  dismiss based on qualified immunity because "the unlawfulness of Defendants'

5  alleged actions was clearly established by the combination of two of our

6  precedents." *Id.* (citing *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992) and *Pauluk

7  v. Savage,* 836 F.3d 117 (9th Cir. 2016)).

8          Here, the unlawfulness of Randall's conduct was clearly established by

9  *Grubbs,* which also involved claims brought by a female prison employee who was

10  violently attacked by an inmate. In *Grubbs*, the Ninth Circuit recognized a state-

11  created-danger claim arising out of a prison's disregard for the safety of one of its

12  employees. *Polanco,* 76 F.4th at 930 (citing *Grubbs*, 974 F.2d at 120–22). The

13  plaintiff, a nurse working in an Oregon correctional institution, was raped by an

14  inmate. 974 F.2d at 120. She claimed that her supervisors had violated her due

15  process rights by requiring her to work alone with a "violent sex offender" who

16  the officers knew was "very likely to commit a violent crime if placed alone with a

17  female." *Id.* The district court dismissed the plaintiff's claims for failure to state a

18  claim. *Id.* The Ninth Circuit reversed, holding that the plaintiff sufficiently alleged

19  a state-created danger claim by alleging that her supervisors "took affirmative

20  steps to place her at significant risk" and "knew of the risks." *Id.* at 122. *Grubbs*

21  puts public officials in a correctional facility on notice that they may be liable

22  under the state-created-danger doctrine in situations where officials take

23  affirmative steps to place an employee at risk, officials know of the risk, and an

24  employee is harmed. *See Polanco*, 76 F.4th at 931. While Defendant seeks to

25  distinguish this case from *Grubbs,* the facts alleged here are sufficiently similar

26  such that this Court cannot conclude "based on the complaint itself, that

27  qualified immunity applies." *Id.* at 925.

28          The Court rejects Defendant's other arguments on qualified immunity.

Defendant argues that this case is distinguishable from *Grubbs* because Randall was not Gorsline's supervisor. (ECF No. 64 at 11–14.) While the plaintiff in *Grubbs* sued her supervisors, the state-created danger test articulated in *Grubbs* was not limited to supervisors. *See Polanco*, 76 F.4th at 930–31 (restating state-created danger test based on *Grubbs*). Defendant argues that Gorsline's third amended complaint omits important details about Kuykendall's dangerousness. But Kuykendall's specific level of risk assessment, which is a factual issue, does not detract from Gorsline's allegation that Randall knew that Kuykendall was a "dangerous inmate with a known propensity for violence." (ECF No. 56 at ¶¶ 17, 78.) Similarly, Defendant's argument that Randall did not leave Kuykendall "with" Gorsline and instead merely left his post, allowing Kuykendall to enter Gorsline's office, seeks to litigate precise factual issues, which is inappropriate at this stage.

The Court cannot conclude, based on the complaint, that qualified immunity applies.

## IV. CONCLUSION

The Court therefore DENIES Defendant's motion to dismiss (ECF No. 64).


DATED: August 15, 2025

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE